**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**LOREN BARBER,**

:

**Plaintiff,**

**Case No. 2:24-cv-3195**

**v.**

**Chief Judge Sarah D. Morrison**
**Magistrate Judge Chelsey M. Vascura**

**CHANCE PATZNICK, *et al.*,**

:

**Defendants.**

**OPINION AND ORDER**

When Chance Patznick started as the superintendent of the Ceder Hill Cemetery in Newark, Ohio, she had a vision for improving the Cemetery's grounds. Part of that vision included enforcing the Cemetery's on-the-books, but often-ignored decorations policy. This change in enforcement upset Loren Barber, whose daughter and parents are buried in the Cemetery. In response, Mr. Barber publicly criticized Ms. Patznick and her decision on Facebook.

His Facebook posts caught the attention of Ms. Patznick, who viewed his posts as threatening. She reported that Mr. Barber made her feel unsafe to multiple City of Newark employees. She also filed several police reports documenting her concerns regarding Mr. Barber and his posts. Eventually, she obtained a civil protective stalking order against him that prevented him from visiting the Cemetery for three days.

Alleging that Ms. Patznick took these actions in retaliation for his First-Amendment protected speech, Mr. Barber sued Ms. Patznick and the City of

Newark under 42 U.S.C. § 1983. Defendants moved for summary judgment. (Mot., ECF No. 53.) That Motion is ripe and, for the reasons below, is **GRANTED**.[1]

## I. BACKGROUND

In January 2023, Ms. Patznick began as the Cemetery and Parks Superintendent of the Cedar Hill Cemetery, a cemetery owned and operated by the City. Her primary responsibility is to care for the Cemetery's grounds and maintain its physical appearance. (ECF No. 51-1, PAGEID # 744; Rhodes Dep., ECF No. 46-1, PAGEID # 359.) She also speaks to the public about the Cemetery, supervises and directs its ground maintenance, oversees its daily operations, and enforces its rules and regulations. (ECF No. 51-1, PAGEID # 744; Patznick Dep., ECF No. 49-1, PAGEID # 558.)

One month after assuming her role as superintendent, Ms. Patznick decided to enforce the Cemetery's existing decorations policy. (Patznick Dep., PAGEID ## 557, 565.) Although the decorations policy had been part of the Cemetery's official rules for nearly a century, it was only sporadically enforced. (Rhodes Dep., PAGEID # 357.) News of the decorations policy's enforcement sparked immediate public backlash. Dozens of residents expressed their dissatisfaction with the decision at Newark City Council meetings held on April 3, April 17, May 1, and May 15. Some filed police reports alleging that their decorations had been removed and vandalized. (*See* ECF No. 51-1, PAGEID ## 760–65.) David Rhodes (Ms. Patznick's

[1] Mr. Barber's Motion for Leave to File Sur-Reply (ECF No. 57) is **GRANTED**.

supervisor and Newark Safety and Service Director) received complaints from individuals calling for Ms. Patznick to be fired. (Rhodes Dep., PAGEID # 374; ECF No. 48-1, PAGEID ## 502–03; ECF No. 52-1, PAGEID ## 781–83.)

Mr. Barber, who visits the Cemetery daily, was one of the more vocal opponents of Ms. Patznick's decision. The policy's enforcement meant that he could no longer keep the solar light he had placed on his daughter's gravesite. He expressed dissatisfaction with the enforcement decision by speaking at all four city council meetings, writing a letter to Mr. Rhodes asking for Ms. Patznick to be fired, and starting a public Facebook campaign criticizing Ms. Patznick, Mr. Rhodes, and the Newark Mayor. (*See* Barber Dep., ECF No. 44-1, PAGEID ## 241–43; Rhodes Dep., PAGEID # 374; ECF No. 48-1, PAGEID ## 502–03.)

Throughout his opposition campaign, Mr. Barber continued his daily visits to the Cemetery. However, he observed that Ms. Patznick and other City employees changed their behavior following the April and May city council meetings. For example, the day after the first meeting, Ms. Patznick asked Mr. Barber what he was doing when he entered the Cemetery. (Barber Dep., PAGEID # 242.) He and other visitors also noticed surveillance by Cemetery employees. (*See* Barber Dep., PAGEID # 248; Bridget Fouty Decl., ECF No. 55-4, ¶ 15; Jennifer Beltagy Decl., ECF No. 55-7, ¶ 9.)

Around the same time, Ms. Patznick told Mr. Rhodes that she "felt threatened by Mr. Barber" and that he had acted aggressively towards her. (Rhodes Dep., PAGEID # 378.) Mr. Rhodes advised Ms. Patznick to call the police if Mr.

Barber or anyone else threatened her. (*Id.*) She also contacted Newark's Law Office about her concerns and was encouraged to "document everything[.]" (Patznick Dep., PAGEID # 583.)

Following that advice, Ms. Patznick asked a Cemetery employee to keep a record of Mr. Barber's visits. (*Id.*, PAGEID # 577.) Then, on April 25, she filed a police report, stating:

> Loren Barber has become increasingly harassing since the end of March. Following decoration policy changes at Cedar Hill Cemetery he has approached me, the cemetery employees, and cemetery visitors. He has followed me around in the cemetery. He is making many accusations online about me. I am feeling unsafe at work and would like this to be documented.

(ECF No. 51-1, PAGEID # 770.) She then spoke to a Newark Police Officer about her report, indicating that she felt the need to document her concerns "just in case it escalates," but that she did not want the Officer to speak with Mr. Barber. (*Id.*, PAGEID # 769.)

Over the next year, Mr. Barber continued his Facebook campaign against Ms. Patznick, Mr. Rhodes, and the Newark Mayor. In March 2024, Mr. Barber posted several comments that Ms. Patznick interpreted as threatening. For example, he posted,

> [I]n my mind, these three can't even try to interpret what God would consider an outrage against their fellow man. Maybe when one of them is struggling for their last breath, they might ponder that question. … We all have our last day here. I hope the day somebody feels their chest tightening up, they think of what I just wrote.

(ECF No. 51-1, PAGEID # 796.) He also commented,

> … I always say at the end of the day, whether I can stop vile people from doing vile things in this world is not the point. Sometimes you

> can. Sometimes you just need karma to take care of it. But I guarantee, no one has ever walked away from me after I'm done, and not regretted the price they paid.

(*Id.*, PAGEID # 793.)

Based on these and other posts, Ms. Patznick filed six police reports between March 28 and April 25, 2024. She reported that Mr. Barber had been taking pictures and videos of her and of various buildings at the Cemetery, in addition to making "concerning" comments about her. (ECF No. 51-1, PAGEID ## 792, 797, 800, 805, 808, 812.) She also reported an incident that occurred months prior at a community festival (not at the Cemetery and outside work hours) that she had not previously reported. (*Id.*, PAGEID # 788) Then, after Mr. Barber posted a photo of himself outside the Cemetery's main office, Ms. Patznick reported that she was "scared that he is at the office given his increasingly concerning behaviors recently" and that she did "not feel safe knowing that he is continuing to get closer." (*Id.*, PAGEID # 805.) The Newark Police took no action beyond documenting Ms. Patznick's concerns.

On April 24, Ms. Patznick reported an alleged disturbance at the Cemetery involving Mr. Barber (the "April 2024 Incident"). Sisters Lois Scarberry and Connie Harbaugh were visiting a gravesite when Mr. Barber approached them about the decorations policy and told them that he and his friends were "trying to change" it. (Barber Dep., PAGEID # 247; Scarberry Aff., ECF No. 53-1, ¶¶ 2–3; Harbaugh Aff., ECF No. 53-2, ¶¶ 2–3.) After Mr. Barber walked away, Ms. Patznick approached the sisters, who told Ms. Patznick that Mr. Barber made them "feel uncomfortable," with one saying that she was worried they would have to pepper spray him.

(Patznick Dep., PAGEID ## 599–600; Scarberry Aff., ¶¶ 4–5; Harbaugh Aff., ¶ 5.) Ms. Patznick reported the incident to the Newark Police non-emergency line. (Patznick Dep., PAGEID # 599.) A Newark Police Officer approached Mr. Barber about the interaction while Mr. Barber was leaving the Cemetery. (Barber Dep., PAGEID # 247.) According to Mr. Barber, the women did not appear disturbed – he simply wanted to tell him about the policy. (Barber Dep., PAGEID # 246.) Mr. Barber spoke to the Officer about the incident for a few minutes and no further action was taken. (*Id.*, PAGEID # 247.)

Feeling increasingly "concerned for [her] safety," Ms. Patznick sought a civil stalking protection order ("CSPO") against Mr. Barber on May 9, 2024. (Patznick Dep., PAGEID # 601.) In her CSPO petition, she catalogued the events of the previous year, stating that she "no longer feel[s] safe," no longer goes into the Cemetery alone, and could not "do [her] job effectively[.]" (ECF No. 52-1, PAGEID # 816.) Although she requested a protection order against Mr. Barber, she did not request that he be prohibited from entering her place of employment. (*Id.*, PAGEID # 815.)

The Licking County, Ohio Common Pleas Court granted her CSPO petition the same day. (*Id.*, PAGEID # 820.) The CSPO prohibited Mr. Barber from contacting Ms. Patznick or coming within 500 feet of her. (*Id.*, PAGEID ## 820–23.) It also prohibited him from entering the Cemetery. (*Id.*, PAGEID # 821.) As a result, Mr. Barber could not visit the Cemetery for three days. (Barber Dep., PAGEID # 249.) Ms. Patznick and Mr. Barber subsequently agreed to terminate the

CSPO and instead entered a no-contact restraining order that allowed him to continue his daily Cemetery visits as long as he remains 450 feet from Ms. Patznick. (ECF No. 52-1, PAGEID # 834.)

One month later, Ms. Patznick called the Newark Police to report seeing Mr. Barber at one of her neighbor's homes, which she believed to violate the restraining order. (ECF No. 52-1, PAGEID # 829.) The distance between Ms. Patznick's home and the neighbor's home measured 472 feet. (*Id.*) Mr. Barber provided a statement to the Newark Police and no further action was taken. (*Id.*, PAGEID ## 831–32.)

In November 2024, Mr. Barber attempted to enter the Cemetery 20 minutes before closing but found that Cemetery employee Terry Frysinger was in the process of closing the entry gates. (*Id.*, PAGEID # 846.) Mr. Barber asked Mr. Frysinger to reopen the gate, but Mr. Frysinger said that he was closing the Cemetery early because he had to go to his other job. (*Id.*) Mr. Barber called the Newark Police and reported that Mr. Frysinger shut the gate on him, striking him on his shoulder. (*Id.*) Ms. Patznick was not at the Cemetery at the time of this incident, so Mr. Frysinger called her about the encounter after Mr. Barber left. (Patznick Dep., PAGEID ## 606–07.) Ms. Patznick then informed Mr. Rhodes that, according to Mr. Frysinger, Mr. Barber was "belligerent, and caused a scene and blocked other people from leaving" the Cemetery. (ECF No. 52-1, PAGEID # 847.) Mr. Rhodes told Ms. Patznick to call the police, but she told him that Mr. Barber had already left and said that she told Mr. Frysinger, "if [Mr. Barber] is in there close to closing time and

doesn't leave or pulls another move like he did tonight to call [the police] immediately." (*Id.*)

One week later, Mr. Frysinger called the police to ask them to remove Mr. Barber, who allegedly refused to leave the Cemetery after being told it would be closing early. (*Id.*, PAGEID # 849.) Mr. Barber left the Cemetery voluntarily and the police took no further action. There is no indication that Mr. Frysinger contacted Ms. Patznick about this incident prior to calling the police.

Based on the foregoing events, Mr. Barber sued Ms. Patznick and the City of Newark under 42 U.S.C. § 1983. He claims that Ms. Patznick retaliated against him for exercising his First Amendment rights and that Newark is liable for her conduct under a theory of *Monell* liability. Defendants move for summary judgment on all claims.

## II. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed

in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## III. ANALYSIS

To state a valid § 1983 claim, a plaintiff must show that a person acting under color of state law deprived him of a right secured by the Constitution or laws of the United States. *Waters v. City of Morristown, Tenn.*, 242 F.3d 353, 359 (6th Cir. 2001). Here, Mr. Barber argues that Ms. Patznick retaliated against him for his speech in violation of the First Amendment when she filed police reports and when she sought a CSPO against him. To hold Ms. Patznick or Newark liable under § 1983, Mr. Barber must first show that Ms. Patznick's challenged conduct was state action. If he makes this initial showing, he must then show that her conduct violated a constitutional right.[2] *Johnson v. Russell*, 155 F.4th 759, 765 (6th Cir.

---

[2] Mr. Barber asserts his claim against Ms. Patznick in her individual and official capacity. (Am. Compl., ¶ 2.) A suit against an individual in her official capacity is treated as a suit directly against the municipality. *Leach v. Shelby Cnty.*

2025). And because the *Monell* theory of Mr. Barber's claim is predicated on Ms. Patznick's conduct, his claim against Newark can only proceed if he demonstrates that Ms. Patznick's conduct caused him a constitutional injury. *Chambers v. Sanders*, 63 F.4th 1092, 1101–02 (6th Cir. 2023). Defendants argue that Mr. Barber fails to create a genuine dispute at all three steps.

### A. State Action

Because § 1983 only protects against actions attributable to a State and not those of a private person, a plaintiff asserting such a claim must make a threshold showing of state action. *Lindke v. Freed*, 601 U.S. 187, 194 (2024). A person's status as a public employee does not automatically make her conduct attributable to the state. *Id.* at 196. Because public officials are also private citizens, the "distinction between private conduct and state action turns on substance, not labels[.]" *Id.* at 197. "Section 1983 is generally not implicated unless a state actor's conduct occurs in the course of performing an actual or apparent duty of [her] office, or unless the conduct is such that the actor could not have behaved as [s]he did without the authority of [her] office." *Waters*, 242 F.3d at 359 (citation omitted). The state-action inquiry turns on whether (1) the official possessed the authority to take the action

---

*Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989). Accordingly, the Court considers Mr. Barber's official-capacity claim against Ms. Patznick as part of his *Monell* claim against Newark. In her individual capacity, Ms. Patznick has raised a qualified-immunity defense. However, because the Court finds that Mr. Barber has failed to carry his burden as to the underlying constitutional violation, the Court limits its analysis to the constitutional injury. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

by virtue of statute, ordinance, regulation, custom or usage; and (2) the official purported to act under that authority on the specific occasion. *Mackey v. Rising*, 106 F.4th 552, 559 (6th Cir. 2024) (citations omitted).

Because the context and substance of a specific action determine whether it is attributable to the state, Ms. Patznick's police reports require further sorting. Most of her reports relate to ongoing personal safety concerns and may be grouped together as such. However, her call regarding the April 2024 Incident stemmed from Mr. Barber's interaction with Cemetery visitors, making it materially distinguishable from her other reports. With respect to the April 2024 Incident, Ms. Patznick possessed the authority to enforce the Cemetery's rules and regulations and preserve its "sanctity[.]" (ECF No. 51-1, PAGEID # 722.) She exercised that authority by reporting an alleged disturbance at the Cemetery to the police. Accordingly, Ms. Patznick's report of the April 2024 Incident constitutes state action.

Conversely, Ms. Patznick's actions relating to her personal safety concerns do not constitute state action. Whether a defendant's conduct is state action depends on the "nature of the act" as compared to her state-assigned responsibilities. *Mackey*, 106 F.4th at 559 (citation omitted). Making statements to the police regarding threatening or harassing behavior and seeking a CSPO are personal pursuits, not official duties. *See Redding v. St. Eward*, 241 F.3d 530, 533 (6th Cir. 2001) ("[M]aking the 911 calls and reports to the responding officers were 'functionally equivalent to that of any private citizen calling for police assistance.'")

(citation omitted). Anyone can report threatening or harassing behavior to the police or seek a CSPO, so Ms. Patznick's actions were not possible only because she was "clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1998). No source of state authority delegated Ms. Patznick the power to act as she did by virtue of her official role. *See Mackey*, 106 F.4th at 563. To the extent she reported concerns about Mr. Barber related to her own safety, she did not act under color of state law.

Notwithstanding the personal nature of Ms. Patznick's conduct, Mr. Barber contends that the Court should find these actions to have been taken under color of state law. A party's private conduct may constitute state action if her conduct is "fairly attributable to the state." *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992) (citation omitted). Courts apply three tests to determine whether a private person's challenged conduct may be "fairly attributable" to the state: (1) the public function test; (2) the state compulsion test; and (3) the symbiotic relationship or nexus test. *Id.* (citations omitted). Mr. Barber argues that the state compulsion test and symbiotic relationship test are implicated here. (Resp., PAGEID ## 963–64.)

*State Compulsion Test*. A private actor's conduct may be considered state action when "a state exercise[s] such coercive power or provide[s] such significant encouragement" that "the choice of the private actor is deemed to be that of the state." *Wolotsky*, 960 F.3d at 1335 (citations omitted). Mr. Barber argues that Newark officials influenced Ms. Patznick's decision to file police reports and seek a CSPO. (Resp., PAGEID # 963.) This is so, he argues, because the City's law office

"encouraged" her to "document everything," she "consulted" with a victim advocate before filing the CSPO petition, and she "informed" Mr. Rhodes and "possibly others" that she planned to do so. (*Id.*) But encouraging Ms. Patznick to document her safety concerns is not the same as coercing or significantly encouraging her to file police reports or seek a CSPO. And more than mere knowledge, "approval or acquiescence in the initiatives of the private party is necessary to hold the state responsible for those initiatives." *Wolotsky*, 960 F.3d at 1335 (citation omitted). It is undisputed the Ms. Patznick decided on her own to file police reports and to seek a CSPO. Her discretionary decisions do not implicate the state compulsion test. *See Blackwell v. Allen*, No. 22-1300, 2022 WL 17832191, at *4 (6th Cir. Dec. 21, 2022) (citing *Ellison v. Garbarino*, 48 F.3d 192, 196 (6th Cir. 1995)).

*Symbiotic Relationship Test*. A public official's private conduct may be considered state action if the conduct was aided by indicia of actual or ostensible state authority. *Mackey*, 106 F.4th at 560. But "there can be no pretense of acting under color of state law if the challenged conduct is not related in some meaningful way either to the actor's governmental status or to the performance of [her] duties." *Burris v. Thorpe*, 166 F. App'x 799, 802 (6th Cir. 2006) (internal citation and quotation omitted).

Mr. Barber argues that Ms. Patznick created a "nexus between her actions and her official authority" by filing her reports and CSPO petition during work hours and using her title in her reports and petition to lend "official weight" to her allegations and "advance her campaign" to exclude him from the Cemetery. (*Id.*,

PAGEID ## 963–64.) That Ms. Patznick identified her role and reported her concerns during work hours does not give her conduct the indicia of government authority. *See Farmer v. Gonzalez*, No. 5:21-49-KKC, 2022 WL 4591637, at *6 (E.D. Ky. Sept. 29, 2022) ("The 'trapping' of identifying oneself as a public official is far short of what is required to constitute state action …."). "It is the nature of the act performed," not the "status of being on duty, or off duty, which determines whether the [official] has acted under color of law." *Morris v. City of Detroit, Mich.*, 789 F. App'x 516, 518 (6th Cir. 2019) (citation modified).

Here, the evidence does not support Mr. Barber's contention that she used her "title and public office to advance her campaign against" him. (Resp., PAGEID # 964.) Ms. Patznick did not ask the police to remove Mr. Barber from the Cemetery in her complaints, she stated only that she wanted to document these incidents due to her safety concerns. She also did not ask that Mr. Barber be excluded from her workplace when she sought a CSPO; after the CSPO was issued, she agreed to revise it to allow him to return to the Cemetery. In these actions, Ms. Patznick did not possess greater or different authority than a private individual would have had simply because she identified her title in her reports and petition. Her conduct did not meaningfully relate to her state-granted authority.

* * *

Ms. Patznick's seeking a CSPO and filing police reports regarding her personal safety concerns are not state action. When she called the police regarding the April 2024 Incident, that was a state action. So, the Court turns to whether Mr.

Barber has sufficiently shown that her report of the April 2024 Incident constitutes First Amendment retaliation.

**B. Constitutional Violation**

"'[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (citation omitted). "If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim." *Id.* (citation omitted). A First Amendment retaliation claim has three elements: (1) the plaintiff engaged in protected conduct; (2) the defendant took an adverse action against him; and (3) there is a causal connection between the protected speech and the adverse action. *Josephson v. Ganzel*, 115 F.4th 771, 783 (6th Cir. 2024) (citation omitted). "The First Amendment protects against only those retaliatory actions that might silence an ordinary person." *Lemaster v. Lawrence Cnty., Kentucky*, 65 F.4th 302, 307 (6th Cir. 2023) (citation omitted). It does not protect against "inconsequential" actions that cause "nothing more than a 'de minimis injury" because those actions would not deter a person of ordinary firmness from engaging in protected conduct. *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 584 (6th Cir. 2012) (citation omitted).

A jury could not reasonably find that Ms. Patznick's report of the April 2024 Incident is an adverse action, so the Court begins and ends its analysis with the second element.

Mr. Barber does not explain how the April 2024 Incident amounts to an adverse action that might silence an ordinary person. Instead, he argues generally that the "false police reports" against him are "part of the permanent public record." (Resp., PAGEID # 967.)

To be sure, the Sixth Circuit has found that, in some circumstances, a release of "irrelevant, humiliating, and confidential information" is sufficient to establish a retaliatory adverse action. *See Bloch v. Ribar*, 156 F.3d 673, 681 (6th Cir. 1998). It has also found that a false report of child abuse can be an adverse action because such report would have "'powerfully dissuasive' consequences that would lead reasonable parents to refrain from engaging in protected activity." *See Wenk v. O'Reilly*, 783 F.3d 585, 595 (6th Cir. 2015).

But Ms. Patznick's report of the April 2024 Incident falls far short of the kind of actions the Sixth Circuit has found to be adverse. First, he has not shown that her account of the April 2024 Incident was false or materially inaccurate (it is supported by the sisters' affidavits). Second, to the extent Ms. Patznick's report of the April 2024 Incident is part of the public record, the mere allegation that he made Cemetery visitors uncomfortable is not the kind of "humiliating" or personal information that would chill a person from continuing to speak if publicly disclosed. *See, e.g., Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 727 (6th Cir. 2010) (falsely stating that the plaintiff was "violating ordinances and that there was a petition against her in the neighborhood" are not adverse actions); *McComas v. Bd. of Educ., Rock Hill Local Sch. Dist.*, 422 F. App'x 462, 469 (6th Cir. 2011) (public

characterization of plaintiff's child as "the initial aggressor" was "not sufficiently embarrassing to constitute an adverse action"). And third, Mr. Barber has provided no evidence of an adverse consequence from the report beyond its existence. *See Brown v. Crowley*, 312 F.3d 782, 801 (6th Cir. 2002) ("Where, as here, a challenged action has no consequences whatsoever, either immediate or long-term, it ineluctably follows that such an action is 'inconsequential.'").

Thus, Mr. Barber has failed to establish that the challenged state action caused him to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in protected speech.

* * *

Ms. Patznick is entitled to summary judgment on Mr. Barber's First Amendment retaliation claim in her individual capacity. Additionally, because "[t]here can be no liability under *Monell* without an underlying constitutional violation[,]" Newark is also entitled to summary judgment, as is Ms. Patznick in her official capacity. *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014).

Defendants' Motion for Summary Judgment is **GRANTED**.

## IV. CONCLUSION

For the reasons stated herein, Defendants' Motion (ECF No. 53) is **GRANTED**.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**